STATE OF MAINE, et al.,
Plaintiffs, Appellees,

v.

DEPARTMENT OF NAVY, et al.,
Defendants, Appellants.

No. 91–1064.

United States Court of Appeals,
First Circuit.

Heard May 6, 1992.
Decided Sept. 1, 1992.

Jeffrey P. Kehne, Attorney, with whom Richard B. Stewart, Asst. Atty. Gen., Mary Elizabeth Ward, Robert L. Klarquist, Attys., Environment & Natural Resources Div., U.S. Dept. of Justice, and James E. Fender, Office of Legal Counsel, Portsmouth Naval Shipyard, were on brief, for defendants-appellants.

Dennis J. Harnish, Asst. Atty. Gen., with whom Michael E. Carpenter, Atty. Gen., Jeffrey R. Pidot and Thomas D. Warren, Deputy Attys. Gen., were on brief, for plaintiffs-appellees.

Catherine R. Connors, Robert E. Cleaves, IV, Janice E. Bryant, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, and Dan W. Reicher, Natural Resources Defense Council, on brief, for Natural Resources Defense Council, amicus curiae.

Lee Fisher, Atty. Gen. of Ohio, Jack A. Van Kley, Asst. Atty. Gen. of Ohio, Counsel of Record for amici, James H. Evans, Atty. Gen., State of Ala., Charles E. Cole, Atty. Gen., State of Alaska, Grant Woods, Atty. Gen., State of Ariz., Winston Bryant, Atty. Gen., State of Ark., Richard Blumenthal, Atty. Gen., State of Conn., Robert A. Butterworth, Atty. Gen., State of Fla., Elizabeth Barrett–Anderson, Atty. Gen. of Guam, Warren Price, III, Atty. Gen., State of Hawaii, Larry Echohawk, Atty. Gen., State of Idaho, Roland W. Burris, Atty. Gen., State of Ill., Linley E. Pearson, Atty. Gen. of Indiana, Bonnie J. Campbell, Atty. Gen. of Iowa, Frederic J. Cowan, Atty. Gen., Com. of Ky., Timothy J. Salansky, Natural Resources and Environmental Protection Cabinet, Com. of Ky., William J.

Guste, Jr., Atty. Gen., State of La., J. Joseph Curran, Jr., Atty. Gen. of Maryland, Frank J. Kelley, Michigan Atty. Gen., Hubert H. Humphrey, III, Atty. Gen., State of Minn., William L. Webster, Atty. Gen., of Missouri, Katherine J. Orr, Sp. Asst. Atty. Gen., State of Mont., Frankie Sue Del Papa, Atty. Gen., State of Nev., Robert J. Del Tufo, Atty. Gen. of New Jersey, Tom Udall, Atty. Gen., State of N.M., Lacy H. Thornburg, Atty. Gen., State of N.C., Nicholas J. Spaeth, Atty. Gen., State of N.D., Dave Frohnmayer, Atty. Gen., State of Or., T. Travis Medlock, Atty. Gen. of South Carolina, Charles W. Burson, Atty. Gen. and Reporter, State of Tenn., Dan Morales, Atty. Gen. of Texas, Nancy N. Lynch, Asst. Atty. Gen. of Texas, Paul Van Dam, Atty. Gen. of Utah, Denise Chancellor, Asst. Atty. Gen. of Utah, Mary Sue Terry, Atty. Gen., Com. of Va., Kenneth O. Eikenberry, Atty. Gen., State of Wash., Joseph B. Meyer, Atty. Gen., State of Wyo., and Gale A. Norton, Atty. Gen. of Colo., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., and Daniel S. Miller, First Asst. Atty. Gen., State of Colo., on brief for Alabama, Alaska, Arizona, Arkansas, Connecticut, Florida, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oregon, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, Wyoming, and Colorado, amici curiae.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BREYER, Chief Judge.

The basic issue on this appeal is whether the federal government has waived its sovereign immunity from punitive fines and various monetary fees imposed upon federal facilities under a state hazardous waste law. A recent Supreme Court decision, *United States Dep't of Energy v. Ohio*, —— U.S. ——, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992), answers most of the questions before us in a manner favorable to the immunity claims of the federal government. That case requires us to vacate the judgment of the district court and remand this case. We shall briefly explain why.

I

*Background*

The Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6992k, sets federal standards regulating hazardous waste disposal; it permits states (under certain circumstances) to promulgate and administer their own hazardous waste regulations in lieu of the federal program, § 6926; and it requires federal facilities to comply with those state laws, § 6961.

In 1986, Maine brought this lawsuit against the United States Navy, claiming that the Navy's shipyard in Kittery, Maine, had not complied with Maine's federally-approved hazardous waste laws. Eventually, the Navy agreed to comply with state regulations. The Navy, however, claiming sovereign immunity, refused to pay punitive fines that state law imposed for past noncompliance; and, it also refused to pay certain state fees (and related fines for nonpayment of those fees). The Navy moved for summary judgment on the ground of sovereign immunity. The district court denied the motion, concluding that the federal government had waived its sovereign immunity in respect to both the fines and the fees. *See Maine v. Department of Navy*, 702 F.Supp. 322, 330, 331–332 (D.Me.1988).

Maine and the Navy then entered into a consent decree. That decree permits the Navy to appeal the district court's decision denying the Navy's motion for summary judgment. The decree also specifies that, if the district court's determination concerning waiver of sovereign immunity is upheld, the Navy will pay Maine:

1. Civil penalties, amounting to $887,200, for past violations of Maine's Hazardous Waste Law. Me.Rev. Stat.Ann. tit. 38 § 349(2).
2. Past licensing and generator fees for the period 1980 to 1988, amounting to a total of $91,962. *See* Me.Rev.Stat.

Ann. tit. 38 § 1319–H(2)(C) (annual license fee of $500 for other hazardous waste facility); § 1319–I(1)(A) (fee of 2¢ per pound for "hazardous waste which is disposed of on the site of generation").

3. Penalties totalling $175,924, for late payment of the 2¢ per pound waste disposal fee. Me.Rev.Stat.Ann. tit. 38 § 1319–I(6) (penalty of three times fee if fee not paid within six months).

We must now decide whether or not the federal government has waived its sovereign immunity in respect to these fines and fees imposed by Maine law.

## II

### The Civil Penalties

■ Maine successfully argued in the district court that the federal government waived its sovereign immunity from state-imposed, punitive, civil penalties, such as the penalties before us, by enacting § 6001 of RCRA, 42 U.S.C. § 6961, which reads, in relevant part:

Each department, agency, and instrumentality of . . . the Federal Government . . . engaged in any activity resulting . . . in the disposal or management of . . . hazardous waste shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges.

In *Department of Energy v. Ohio*, the Supreme Court considered the same question and concluded that the position taken by Maine and the district court was wrong. The Court held that RCRA does not "subject the United States to an enforcement mechanism" of punitive fines. —— U.S. at ——, 112 S.Ct. at 1640; *see also id.* —— U.S. at ——, 112 S.Ct. at 1644 (White, J.,

concurring in part and dissenting in part). That holding virtually disposes of the issue before us, requiring us to reverse the district court.

■ We say "virtually," and not "definitively," because Maine has raised an argument on this appeal that was not before either the Supreme Court in *Department of Energy v. Ohio* or the district court in this case. Maine has pointed to a different federal statute, § 120 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9620, which reads, in relevant part:

State laws concerning removal and remedial action, including state laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States . . . .

42 U.S.C. § 9620(a)(4). Maine argues that this statute applies to, and waives sovereign immunity from, the fines at issue here.

We shall put aside, for the sake of argument, the fact that, during over four years of litigation, Maine did not mention this statute until its brief on this appeal. *But see Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 21 (1st Cir.1992) ("[A]bsent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.") (citing cases); *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 73 (1st Cir.) (same), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984). Nonetheless, we do not believe that § 120 of CERCLA waives the federal government's sovereign immunity. We recognize that this statute uses language that differs somewhat from the language of RCRA. The CERCLA language subjects the United States to "state laws regarding enforcement;" RCRA's language subjects the United States to "all . . . State . . . requirements, both substantive and procedural (including . . . any provisions for injunctive relief and such sanctions as may be imposed by a court to

enforce such relief)." In light of the holding and reasoning of *Department of Energy v. Ohio,* however, we do not think these linguistic distinctions make a critical difference.

For one thing, the Supreme Court has insisted that language waiving sovereign immunity be clear and unequivocal. *Department of Energy,* —— U.S. at ——, 112 S.Ct. at 1633 (citing *United States v. Mitchell,* 445 U.S. 535, 538–39, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980)); *United States v. Nordic Village, Inc.,* —— U.S. ——, ——, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992). The language of CERCLA § 120, like that in RCRA, is unclear in the same relevant respect, namely, it could refer (1) to prospective coercive fines, (2) to *retrospective* civil penalties, or (3) to both. Language of a different statute that the Supreme Court considered in *Department of Energy*—language in the Clean Water Act stating that the federal government is "subject to ... all ... State ... sanctions," 33 U.S.C. § 1323(a)—suffered the same kind of infirmity. *See* —— U.S. at —— – ——, 112 S.Ct. at 1636–37. For similar reasons, Maine's argument is open to the Supreme Court's observation concerning RCRA § 6961 that

> the statute makes no mention of any mechanism for penalizing past violations, and this absence of any example of punitive fines is powerful evidence that Congress had no intent to subject the United States to an enforcement mechanism that could deplete the federal fisc regardless of a responsible officer's willingness and capacity to comply in the future.

—— U.S. at ——, 112 S.Ct. at 1640; *see also id.* —— U.S. ——, 112 S.Ct. at 1644 (White, J., concurring in part and dissenting in part) ("The section makes no reference to civil penalties...."). 

For another thing, the legislative history of CERCLA is not particularly helpful to any effort to distinguish *Department of Energy.* Maine points to various comments by legislators suggesting that they believed that the language of CERCLA § 120 did, in fact, waive sovereign immunity from punitive civil fines. *See* Joint Explanatory Statement of the Committee of Conference, Superfund Amendments and Reauthorization Act of 1986, Conf.Rep. 962, 99th Cong., 2d Sess. (1986), *reprinted in* 132 Cong.Rec. H9083, 9101 (daily ed. Oct. 3, 1986); 132 Cong.Rec. S14899, 14902 (daily ed. Oct. 3, 1986) (statement of Sen. Stafford explaining Conference Committee report); 132 Cong.Rec. S14913, 14918 (daily ed. Oct. 3, 1986) (comments of Sen. Mitchell). These comments, however, refer *both* to § 6001 of RCRA *and* to CERCLA § 120. They do not describe whether, or how, CERCLA might differ from RCRA on this point; and, they certainly do not allow us to distinguish CERCLA § 120 from RCRA § 6001 and the Court's holding in *Department of Energy. See* —— U.S. at ——, 112 S.Ct. at 1639–40. We therefore conclude that *Department of Energy* requires us to hold that CERCLA § 120, like RCRA § 6961, does not provide an adequately clear waiver of sovereign immunity from the civil penalties sought by Maine.

### III

### *The Fees*

The Navy has argued, in relevant part, that it is immune from the Maine statute's $500 licensing fee and its two cents per pound generating fees because (1) the federal government has waived its immunity only in respect to *reasonable* fees, and (2) the fees at issue here are unreasonably high. The district court denied the Navy's motion for summary judgment in respect to these fees because it concluded that the licensing and generating fees were "requirements," for which § 6961 waived sovereign immunity. *See* 702 F.Supp. at 331–32. While our reasoning differs somewhat from that of the district court, we conclude that the district court properly denied the Navy's summary judgment motion.

### A. *Immunity from unreasonable fees*

■ In our view, RCRA's language subjecting the federal government to "all" requirements, including "any requirements for permits," does not waive the sovereign immunity of the United States from *unreasonable* fees. The law has long distin-

guished between reasonable state regulatory fees that apply to the federal government and unreasonably high fees. The law typically treats unreasonably high regulatory charges as "taxes" that the Constitution forbids the state to assess against the federal government without explicit consent. *See Federal Land Bank v. Crosland,* 261 U.S. 374, 378, 43 S.Ct. 385, 386, 67 L.Ed. 703 (1923) (Holmes, J.); *United States v. City of Columbia,* 914 F.2d 151, 153–54 (8th Cir.1990); *United States v. Maine,* 524 F.Supp. 1056, 1058–59 (D.Me. 1981) (citing cases). The concerns that led to the development of this case law, such as fears of unjustified raids on the federal treasury by states or attempts by states to discourage federal activity within their borders, would seem applicable in the present context. *See McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 426–27, 4 L.Ed. 579 (1819); *Public Util. Comm'n v. United States,* 355 U.S. 534, 543–44, 78 S.Ct. 446, 452–53, 2 L.Ed.2d 470 (1958) (citing cases). In the absence of any competing consideration, considerations of simplicity and legal coherence militate strongly in favor of interpreting this statute consistently with longstanding legal precedent in a related area.

We can find no competing or offsetting consideration here. Congress said nothing in either the statute or its history that suggests a willingness to have the federal government pay *un*reasonable fees. To the contrary, Congress, in the statute itself, said that the requirements to which it subjected the federal government "includ[e] the payment of *reasonable* service charges." 42 U.S.C. § 6961 (emphasis added). A regulatory, or licensing, fee, insofar as it is reasonable, seems properly viewed as a kind of charge for a regulatory, or administrative, "service." And, this language therefore provides a strong additional reason against finding in the statute a waiver of sovereign immunity from *un*reasonable regulatory charges, whether they are called "licensing fees," or "generating fees," or go by some other name.

We recognize one possible argument to the contrary. In *Environmental Protection Agency v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 217, 96 S.Ct. 2022, 2030, 48 L.Ed.2d 578 (1976), a case interpreting § 313 of the Clean Water Act, the Supreme Court said that language subjecting the United States to state "service charges" did not automatically subject the federal government to all charges that defray state regulatory costs. The Court in that case, however, was faced with a different statute and a different issue. That version of § 313 did *not* seem to subject federal facilities to state permitting requirements. And, the Court had to decide whether the language "including reasonable service charges" nonetheless did so. The Court held that the words "service charges" in that context did not, by themselves, show an intent to subject federal facilities to state regulation. The statute here, however, clearly requires the Navy to have a state permit. *See* 42 U.S.C. § 6961 ("including any requirement for permits"). In this context, we believe the use of the word "reasonable" in respect to "service charges" shows an intent that permit fees and other fees related to the costs of regulating must be reasonable.

### B. *The reasonableness of the fees*

We do not agree with the Navy, however, in its claim that it is entitled to summary judgment because the record demonstrates that the fees at issue are, as a matter of law, unreasonable. The fees are not designed simply to raise money for general revenue purposes. *Cf. Butler v. Maine Supreme Judicial Court,* 767 F.Supp. 17, 19 (D.Me.1991) ("[L]evies assessed for regulatory ... purposes, even though they may also raise revenues, are generally not 'taxes.'"). They are like a "classic 'regulatory fee' ... imposed by an agency upon those subject to its regulation," and used, for example, to "rais[e] money placed in a special fund to help defray the agency's regulation-related expenses." *San Juan Cellular Telephone Co. v. Public Service Comm'n of Puerto Rico,* 967 F.2d 683, 685 (1st Cir.1992) (citations omitted); *see also South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 887 (4th Cir.1983), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984). The

money assessed by Maine goes into a state Hazardous Waste Fund used to pay salaries and other costs of personnel and equipment used to supervise and enforce state hazardous waste laws, including costs of site inspections and clean-up of hazardous waste spills. *See* Me.Rev.Stat.Ann. tit. 38 § 1319–E(1).

The Supreme Court, in a related context, has found regulatory charges on a governmental entity permissible

> [s]o long as the charges do not discriminate ..., are based on a fair approximation of use of the system, and are structured to produce revenues that will not exceed the total cost ... of the benefits to be supplied....

*Massachusetts v. United States*, 435 U.S. 444, 466–67, 98 S.Ct. 1153, 1167, 55 L.Ed.2d 403 (1978). Other courts have used this test in legal contexts such as the one before us. *See New York State Dep't of Envtl. Conservation v. United States Dep't of Energy*, 772 F.Supp. 91, 99 & n. 9 (N.D.N.Y.1991) (using *Massachusetts* test to determine "reasonable service charges" under RCRA § 6961); *see also United States v. Maine*, 524 F.Supp. at 1059 (using *Massachusetts* test for state levy on federal facility); *cf.* Barry Breen, "Federal Supremacy and Sovereign Immunity Waivers in Federal Environmental Law," 15 *Envtl. L.Rep.* 10326, 10330 (1985) (*Massachusetts* standard appropriate for § 6961); William D. Benton & Byron D. Baur, "Applicability of Environmental 'Fees' and 'Taxes' to Federal Facilities," 31 *Air Force L.Rev.* 253, 254–55 (1989) (same); Patrick A. Genzler, "Federal Facility Payment of State Environmental Fees," 38 *Naval L.Rev.* 149, 158 (1989) (same). *But cf. United States v. City of Columbia*, 914 F.2d at 153–54 (refusing to apply *Massachusetts* standard to municipality's charge on federal agency). And, Maine's fees may well satisfy this test.

■ The record contains documents, cited by the Navy (*see* Navy Brief at 7 n. 5), indicating that the Hazardous Waste Fund spent, for enforcement and licensing costs, $177,000 in 1984, $259,000 in 1985, and $245,000 in 1986. During that time, waste producers in Maine paid fees and assessments amounting to $196,000 (1984), $193,-

000 (1985), and $249,000 (1986). The record also contains documents indicating that in the three years 1985, 1986, and 1987, the Navy's assessed fees amounted to $54,500, while Maine's estimate of the cost of state regulatory activities related to the Navy's Kittery shipyard amounted to $61,000. Affidavit of Stacy Ladner, Environmental Scientist, Maine Department of Environmental Protection, Appendix at 253, 254. These documents suggest a rough relation between state regulatory costs and the fees charged. And, such a rough relation is sufficient to show that a state regulatory charge is a reasonable and permissible fee, and not an impermissible "tax" on a federal installation. *See Massachusetts v. United States*, 435 U.S. at 468–69, 98 S.Ct. at 1167–68; *San Juan Cellular*, 967 F.2d at 687; *New York State Dep't of Envtl. Conservation*, 772 F.Supp. at 100.

We do not find the Navy's arguments to the contrary convincing. First, the Navy points out that much of the state Fund pays for a spill response team, whose work provides a general benefit to the public. It adds that fees that finance a general, widely available, benefit are impermissible "taxes," not permissible regulatory fees. We agree that financing a general public benefit is one of the important criteria for determining that a charge is a "tax" and not a "fee." *See San Juan Cellular*, 967 F.2d at 685. And, clean-up does benefit the general public (as do most regulatory expenditures). But the presence of a state spill response team does more than provide a general benefit. It also benefits the regulated entities in a special way. It helps to insure their compliance with state goals and standards for prompt clean-ups. In our view, a state spill response team (perhaps like airplane safety inspectors, or crash investigators, or special airport rescue teams) bears a close enough relation to the regulatory process as to permit a state's assessing regulated entities that may cause spills a special charge for its support. *See, e.g., Massachusetts v. United States*, 435 U.S. at 468, 98 S.Ct. at 1167 (aircraft may be assessed to support federal navigational facilities). *Cf. Mississippi Power & Light Co. v. United States Nuclear Regulatory Comm'n*, 601 F.2d 223, 228,

231–32 (5th Cir.1979) (upholding NRC's charge of a "fee" when it supported costs of "environmental reviews," "uncontested hearings," and "administrative and technical support" for licensing procedures), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980).

Second, the Navy argues that the state response team has never responded to a spill at the shipyard; hence, the Navy contends, it has received no benefit, and the regulatory fees are not based on a "fair approximation" of its use of the system. *Massachusetts v. United States*, 435 U.S. at 466, 98 S.Ct. at 1167; *New York State Dep't of Envtl. Conservation*, 772 F.Supp. at 100. The record as it now stands, however, does not require judgment for the Navy on this point. It indicates that the state's spill response capability is available to minimize any future spill at the shipyard. The Navy therefore seems to benefit from the team's availability, even though, in fact, it has never used the team. Moreover, considered as a class, generators of hazardous waste benefit from the state's emergency clean-up capability. And, the law does not require a precise correlation between regulatory fees collected and regulatory services provided to each regulated firm. *See Massachusetts v. United States*, 435 U.S. at 468, 98 S.Ct. at 1168 ("[E]ven those aircraft, if there are any, that have never received specific services from the National Government benefit from them in the sense that the services are available for their use if needed and in that the provision of the services makes the airways safer for all users."); *New York State Dep't of Envtl. Conservation*, 772 F.Supp. at 100 ("[T]he federal government also benefits from EnCon's services because the NYDEC's programs and services are available for the United States' use if the same are needed by it in the future.").

The case that the Navy cites in support on this point, *National Cable Television Ass'n v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), is inapposite. As we recently explained, *see San Juan Cellular*, 967 F.2d at 686–87, the *National Cable* Court, which held that "the measure of the authorized fee" is " 'value to the recipient,' " *National Cable*,

415 U.S. at 342–43, 94 S.Ct. at 1150 (quoting statute), was interpreting a specific and special statute authorizing agencies to levy a fee. "[T]he courts have read the Supreme Court's language in *National Cable* as limited to its specific statutory context." *San Juan Cellular*, 967 F.2d at 687; *see, e.g., Union Pac. R.R. Co. v. Public Util. Comm'n*, 899 F.2d 854, 861 (9th Cir.1990).

Third, the Navy argues that the state's regulatory fees are not proportionate to regulatory costs because Maine also receives annual grants from the U.S. Environmental Protection Agency, *see* 42 U.S.C. § 6931, which it uses to help finance those costs and which, together with the fees, create a surplus in the state's Hazardous Waste Fund. Taking grants and fees together, the Navy contends, the federal government pays twice for the same service. If we assume this is so, however, why should the law necessarily allocate the Fund surplus to the state's fees, rather than to the EPA grants? The record does not indicate that EPA *must* contribute to the creation of any such surplus, nor explain why it would do so. *Cf. id.* (grants to be allocated to states by EPA administrator on the basis of various factors). Nor has the Navy explained why an EPA decision to make *additional* money available to the Fund would render unreasonable regulatory fees that roughly approximate regulatory costs.

We conclude that the sparse record before us, in its present form, does not entitle the Navy, as a matter of law, to judgment on its claim that the state's fees are unreasonably high. The district court's denial of the Navy's motion for summary judgment on this issue was therefore legally correct.

## IV

### *Penalties for Nonpayment of the Fees*

■ The district court also held that the state of Maine could recover "a penalty of triple fees for those fees which are more than six months overdue," 702 F.Supp. at 330 n. 9, penalties that, according to the consent decree, amount to approximately $175,000. This holding, however, cannot survive the Supreme Court's decision in *Department of Energy v. Ohio*.

As we have pointed out, in *Department of Energy*, the Court held that the federal government had not waived sovereign immunity in respect to punitive fines, fines "imposed to punish past violations of ... statutes or state laws." —— U.S. at ——, ——, 112 S.Ct. at 1632, 1640. The penalty in question is explicitly termed a "[p]enalty for late payment of fee." Me.Rev.Stat. Ann. tit. § 1319–I(6). The fine amounts to a penalty for past conduct, not a coercive effort "imposed to induce [federal agencies] to comply with injunctions or other judicial orders designed to modify behavior prospectively." *Department of Energy*, —— U.S. at ——, 112 S.Ct. at 1632. *Cf. United States v. Halper*, 490 U.S. 435, 448, 109 S.Ct. 1892, 1902, 104 L.Ed.2d 487 (1989) ("[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term."). Consequently, we reverse the district court's holding.

In sum, the judgment of the district court is vacated. The case is remanded for further proceedings consistent with this opinion.